UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

LAGENE C. MCGHEE,

                    Plaintiff,

    v.                                        Case No. 23-cv-24-pp

IRIS N. TORRES, *et al.*,

                    Defendants.

## ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 62, 67, 74) AND DISMISSING CASE

Plaintiff Lagene C. McGhee, who was incarcerated when he filed this case and is representing himself, filed a complaint alleging violations of his constitutional rights. The court screened the complaint and allowed the plaintiff to proceed on Eighth Amendment claims against defendants Iris Torres and Julie Capraro for allegedly failing to treat the plaintiff's extreme pain after he fell at the Manitowoc County Jail. Dkt. No. 5 at 11. The court also allowed the plaintiff to proceed on an Eighth Amendment claim against defendant Dilip Tannan for an alleged delay in treating the plaintiff's painful condition when he was confined at Oshkosh Correctional Institution. Id. at 12-13. The defendants, who are represented by separate counsel, each have filed a motion for summary judgment. Dkt. Nos. 62, 67, 74. This order grants those motions and dismisses the case.

1

## I.    Facts[1]

### A.    Manitowoc County Jail

On May 18, 2021, the plaintiff was booked into the Manitowoc County Jail. Dkt. No. 76 at ¶1. At the time of his booking, the plaintiff already was taking Meloxicam for arthritis, a left meniscus torn in 2015 and low back pain. Id. at ¶3. On May 27, 2021, Dr. Torres, the jail physician, renewed the plaintiff's Meloxicam prescription. Id. at ¶4.

On May 30, 2021, the plaintiff slipped and fell while cleaning an area of the jail. Dkt. No. 69 at ¶2; Dkt. No. 76 at ¶5. Nurse Popp (not a defendant) arrived a few minutes later and assessed the plaintiff. Dkt. No. 69 at ¶3; Dkt. No. 76 at ¶6. The medical notes from her assessment state:

> Speech clear. Denies hitting head or losing consciousness. Complains of lower back pain and left knee pain. Patient reports history of torn meniscus in 2015. Reports history of chronic back pain. Writer [checked] outside uniform for any gross deformities, none noted. No noted swelling to left knee. Patient denies tingling to extremities. Able to wiggle toes and flex and extend toes. Patient says painful to bend knee. Rating pain 8 out of 10. With assistance patient able to get in wheelchair. Escorted to 1R1. Patient able to bear weight on left leg. Patient seen via camera standing at toilet in cell.

Dkt. No. 69 at ¶4. After assessing the plaintiff, Nurse Popp called Dr. Torres to report the incident and determine how to proceed with the plaintiff's medical care. Id. at ¶5. Torres prescribed the plaintiff a five-day regimen of Tylenol for pain management, placed the plaintiff on medical observation (which required him to be observed at thirty-minute intervals) and asked nursing staff to assess him again the next day. Id. at

---

[1] The court includes only material, properly supported facts in this section. See Fed. R. Civ. P. 56(c).

¶7. Popp then gave the plaintiff his prescribed Tylenol and moved him to a medical observation cell. Id. at ¶8; Dkt. No. 76 at ¶7.

That evening, a jailer gave the plaintiff Meloxicam but did not give him any Tylenol. Dkt. No. 69 at ¶9. The plaintiff informed the jailer that he recently was prescribed Tylenol, but the jailer stated that there was no record of that. Id. at ¶10.

At 9:00 a.m. on May 31, 2021, Nurse Capraro assessed the plaintiff. Dkt. No. 69 at ¶11. The records from Capraro's assessment state:

> Patient laying on bunk with head covered on right side. Complaint of pain to lower/mid back and left knee torn meniscus. Patient stated pain is 10 out of 10. The pain is in my back maybe my pelvis. Patient states unable to get up. Pain that bad. Patient assisted to sitting position. Patient kept leaning to right side. Patient complains bar on bunk hurting left knee. Patient stated left knee has torn meniscus and now in pain related to fall. No swelling or inflammation noted to back or left lower back. Patient stated my cell mate even said it was swollen. Patient refused to try to stand to use bathroom or further assessment. Patient assisted to get leg back on bunk.

Id. at ¶12. During the assessment, the plaintiff informed Capraro that he had not received his prescribed Tylenol the prior evening. Id. at ¶13. Capraro immediately investigated, clarified any miscommunication between Nurse Popp and the jailers regarding the plaintiff's medications and then "came back with [Plaintiff's Tylenol] medication." Id. at ¶14. Capraro spoke with Dr. Torres who provided her a prescription for Tylenol 1000 mg for seven days, an ice pack and continued medical monitoring. Dkt. No. 76 at ¶8. The plaintiff testified at his deposition that Capraro resolved all issues regarding his medications at that time. Dkt. No. 69 at ¶15. He also testified that he did not experience any other issues regarding his medications at the jail. Id. at ¶16.

The next day—June 1, 2021—Nurse Capraro assessed the plaintiff. Dkt. No. 69 at ¶19. The records from that assessment state:

> Patient ambulated with steady gait, slight bend. Sat bent forward in chair slightly tilted to right. Complained of spinal cord being pulled. Pelvic pain to both sides, but mainly left. Said 'the Tylenol don't last till the next med pass. I am in pain all the time. Patient stood up without assistance from chair. Bent over and ambulated with steady faint back to block. No limp noted with ambulation.

Id. at ¶20. After the assessment Capraro called Dr. Torres to discuss the information she obtained during the assessment, and to determine how to proceed with the plaintiff's medical care. Id. at ¶21. Torres ordered x-rays, continued the medications and asked nursing staff to assess the plaintiff again the next day. Id. at ¶22; Dkt. No. 76 at ¶9. Torres also said she would personally examine the plaintiff the next day. Dkt. No. 69 at ¶23.

On June 2, 2021, Nurse Popp assessed the plaintiff. Dkt. No. 69 at ¶24. The records from the assessment state:

> Complaining of lower back pain and pelvic pain after he took a fall in the restroom outside the shower area. Did not hurt his head. Ambulates hunched over without assistance. No vertebral tenderness, sat into chair and out of chair without difficulty. Extended both legs without difficulty.

Id. at ¶25. Dr. Torres also examined the plaintiff that day. Dkt. No. 76 at ¶10. Torres held the plaintiff's Meloxicam prescription, prescribed Prednisone 20 mg daily for five days and continued Tylenol 1000 mg daily for seven days. Id.; Dkt. No. 69 at ¶¶26-27.

On June 3, 2021, the plaintiff received x-rays which showed no acute abnormalities of alignment, no radiographic evidence of acute fracture, no bone lesions and no bony narrowing of the spinal canal and no dislocation. Dkt. No. 76 at ¶11. Dkt. No. 69 at ¶28. That day, Nurse Capraro contacted Dr. Torres to discuss the radiology report and to determine how to proceed with the plaintiff's medical care. Id. at ¶29; Dkt. No. 76 at ¶12. The jail observation logs indicate that the plaintiff was observed standing and walking around the cell

4

block on (and before) June 3, 2021. Dkt. No. 69 at ¶30. On June 3, 2021, he walked to and from his cell block to another area of the jail to obtain a haircut. Id. at ¶31. That day, Torres removed the plaintiff from medical observation and had him placed in general population with a lower bunk restriction. Id. at ¶32.

On June 5, 2021, the plaintiff requested an MRI. Dkt. No. 76 at ¶13. Dr. Torres considered the request but did not feel there was any clinical indication that the plaintiff needed an MRI. Id. Three days later, on June 8, 2021, Torres restarted the plaintiff's Meloxicam prescription. Id. at ¶14.

On June 10, 2021, the plaintiff transferred to Dodge Correctional Institution. Dkt. No. 69 at ¶36; Dkt. No. 76 at ¶15. Nurse Capraro completed a "Health Transfer Summary" and provided Dodge with a copy of it. Dkt. No. 69 at ¶37. This was done to triage and communicate the plaintiff's medical issues and medical care to staff at Dodge. Id.

B.    Oshkosh Correctional Institution

On August 4, 2021, after a short stay at Dodge, the plaintiff moved to Oshkosh Correctional Institution. Dkt. No. 64 at ¶1. Dr. Tannan worked as a physician at Oshkosh where he provided professional medical services to incarcerated individuals. Id. at ¶¶2, 4. Tannan did not set his own schedule for seeing patients. Id. at ¶6. Nursing staff prioritized incarcerated individuals for appointments based on their professional judgment. Id. At Oshkosh, the treating nurse assesses a patient and, if she/he believes further treatment is needed, she/he will direct the Medical Program Assistant Associate ("MPAA") to schedule an appointment with Tannan. Id.

The day after the plaintiff arrived at Oshkosh—August 5, 2021—Dr. Tannan received a phone message from MPAA Ehnert stating that the plaintiff had arrived with an order to see "a Dodge Correctional Institution . . .

Orthopedics;" Ehnert asked if he could cancel that order and enter an appropriate orthopedic referral. Dkt. No. 64 at ¶¶7-8. That same day, Tannan placed an order for the plaintiff to be seen by Tannan for his knee complaints. Id. at ¶9. Tannan wanted to evaluate the plaintiff before ordering any referrals. Id.

On August 10, 2021, Nurse Sorenson (not a defendant) saw the plaintiff for musculoskeletal complaints. Dkt. No. 64 at ¶10. Sorenson reported that the plaintiff had a history of untreated left meniscus tear and arthritis and that he used supplements outside corrections with great success. Id. She also reported that the plaintiff was given Meloxicam while in jail with good success. Id. He had undergone physical therapy and was educated on stretches and strengthening, which he still performed. Id. She educated the plaintiff on ordering supplements, provided him with ibuprofen and told him to alternate with Tylenol. Id. Sorenson also told the plaintiff that he had an upcoming advanced care provider ("ACP") appointment. Id.

On August 25, 2021, Dr. Tannan saw the plaintiff regarding ongoing symptoms pertaining to his left knee pain and back pain. Dkt. No. 64 at ¶12. The plaintiff reported continued knee pain with increased discomfort after walking and off-and-on swelling; he denied any joint "lockup" and reported that the knee pain was worse with flexion beyond 90 degrees. Id. He also reported complaints of left lumbar pain going down into the hip area. Id. He currently was not on any medication. Id. A locked-up knee gets stuck in one position due to flipping or folding of the meniscus in the knee joint or when a floating loose body gets jammed between the femur and the tibia. Id. at ¶13. The plaintiff told Tannan that the initial injury to his left knee occurred in county jail in 2016 when a sliding door hit his left knee from the lateral aspect (the side). Id. at

6

¶14. He was evaluated in February 2016, had an MRI and was evaluated by an orthopedic physician. Id. The 2016 MRI showed degenerative arthritis, medial meniscal degenerative tear and loose bodies. Id. At that time, arthroscopy was not recommended. Id. Since then, the plaintiff had been released and incarcerated a couple of times and during that time he stated he did not seek any medical attention outside of the prison system. Id. The plaintiff reported the back pain being a result of a slip and fall in jail in May of 2021. Id. He stated he had an x-ray of his back in the past. Id.

During the August 25, 2021 visit, Dr. Tannan noted that the plaintiff walked with a slight limp, favoring the left knee. Dkt. No. 64 at ¶15. Tannan examined the plaintiff's left knee and noted mild degenerative joint swelling, moderate crepitus with range of motion drawer sign negative, no laxity to valgus or varus stress and good range of motion. Id. Tannan reviewed the x-ray of the plaintiff's left knee, which showed degenerative spurring and also possible loose bodies on the posterior aspect of the femoral condyles. Id. Loose bodies are free floating pieces of bone spurs or cartilage that are not attached to the large bones of the knee. Id. at ¶16. On examination of the plaintiff's lumbar area, Tannan found no specific tenderness but there was diffuse pain in the left paraspinal muscles going into the left gluteal area, and he had good range of motion in the hip joints. Id. at ¶17. Tannan gave the plaintiff an extra patella stabilizer knee brace, placed an order for naproxen 500 mg as needed for pain and ordered pelvis and lumbar spine x-rays. Id. He gave the plaintiff the knee brace to stabilize the knee joint because the plaintiff complained of pain with flexion over 90 degrees. Id. at ¶18. The knee brace would limit the plaintiff's ability to flex his knee to the degree that was causing him pain. Id. Tannan's hope was that the brace would provide the plaintiff with comfort and

pain relief. Id. The plaintiff's back pain was related to his muscles and ligaments, so naproxen was given to help reduce the pain and inflammation he was experiencing. Id. at ¶19.

Five days later, on August 30, 2021, the plaintiff had an x-ray of his pelvis and lumbar spine. Dkt. No. 64 at ¶20. The pelvic x-ray showed no acute fracture or dislocation and no acute osseous abnormality. Id. This meant that there were no abnormalities found in the hip joints or pelvic bones to account for the pain symptoms the plaintiff reported. Id. The recommendation was to repeat the x-ray or obtain a CT in one week if symptoms did not resolve or if continued or new ambulatory difficulty was noted. Id. The lumbar spine x-ray showed diffuse osteopenia and an age indeterminate compression deformity of the L3 vertebra meaning that it was unclear when the compression deformity occurred. Id. at ¶21. Osteopenia is a condition where bone mineral density is lower than normal but not low enough to be diagnosed as osteoporosis. Id. The radiologist recommended considering an MRI to further evaluate the plaintiff's lumber spine. Id. Despite the radiologist's osteopenia finding, there was no evidence of osteopenia in the plaintiff's other x-rays, and Dr. Tannan felt it was not necessary to treat at the time. Id. at ¶22.

On September 15, 2021, Dr. Tannan placed an order for the plaintiff to continue physical therapy for his low back pain and left knee. Dkt. No. 64 at ¶23. A week later, the plaintiff had an initial visit with a physical therapist named Paschke. Id. at ¶24. The plaintiff, who was returning to physical therapy as a continuation from the physical therapy he had received at Dodge, said he felt like he was "getting the run around" because no one was treating him for his pain. Id. He reported that his symptoms were unchanged since he had two physical therapy sessions at Dodge and stated that he was unaware

8

that the x-rays from three weeks prior showed an age indeterminate L3 compression fracture. Id. He wanted an MRI to fully diagnose his back pain and brought up his left meniscus tear as well, but reported that his back pain was limiting all of his activities of daily living. Id.

On September 29, 2021, the plaintiff returned to physical therapy with Paschke. Dkt. No. 64 at ¶25. One week later, on October 6, 2021, Paschke discharged the plaintiff, reporting: "Patient states he believes everyone is procrastinating and not giving him the surgery or treatment he needs. Says physical therapy sessions haven't been especially helpful but continues to perform home exercise program as instructed. At this point, just wants to see his provider for reassessment of knee and low back pain." Id. Paschke reported that the plaintiff had been compliant with his physical therapy sessions and home exercise program, noted some discrepancies in his x-rays, found that the plaintiff did not respond to conservative physical therapy and recommended that he follow up with his provider to change the plan of care. Id.

It took about four months for the plaintiff to have his next appointment with Dr. Tannan. Dkt. No. 64 at ¶27. Again, Tannan did not schedule his own appointments, and he did not have control over scheduling. Id. at ¶28. The institution MPAA schedules appointments based on priority of a patient's condition and provider availability. Id. The plaintiff's condition was chronic and non-emergent and likely was given lower priority scheduling to accommodate scheduling more urgent conditions first. Id. at ¶29. This wait occurred during the pandemic when there was an increased demand for medical care in the institutions. Id. at ¶30.

On February 4, 2022, Dr. Tannan saw the plaintiff for a follow-up for complaints of continuing back pain and left knee pain. Dkt. No. 64 at ¶31. The

plaintiff reported that his main symptoms were back pain, specifically when he tried to get up from a supine position or when turning in bed. Id. He reported not being very active and he was not working at the time. Id. At the visit, Tannan noted that the plaintiff previously had undergone an MRI for his left knee, which revealed degenerative changes. Id. at ¶32. The plaintiff also previously had met with an orthopedic specialist, Dr. Grossman, who told him that arthroscopy would not help degenerative arthritic pain. Id. Regarding the plaintiff's back, Tannan noted that the initial x-ray of the plaintiff's back at the county jail did not show any injuries or fracture, however the x-ray taken at Oshkosh on August 30, 2021 showed mild compression at L-3 of his lower back. Id. The plaintiff had tried physical therapy without much improvement in his symptoms. Id. As for medication, the plaintiff reported that he was not getting refills of Naprosyn and Tylenol. Id. In checking the plaintiff's medication, Tannan found that the plaintiff had not submitted any refill requests for several months. Id. Following this visit, Tannan placed an order for Meloxicam to treat the plaintiff's back pain and ordered another MRI of his low back. Id.

On February 6, 2022, the plaintiff had an x-ray of his thoracic spine. Dkt. No. 64 at ¶33. The x-rays showed degenerative disc disease throughout his thoracic spine. Id. On February 11, 2022, Dr. Tannan submitted an off-site service request for the plaintiff to have an MRI of his lumbar spine; the MRI was completed on February 18, 2022 at Ascension Mercy Hospital. Id. at ¶¶34-35. The report from the MRI showed multilevel degenerative changes of the lumbar spine with the greatest changes at L3-L4, L4-L5 and L5-S1, with moderate foraminal stenosis and nerve root effacement at these levels. Id. at ¶¶35-36. The February 18, 2022 MRI indicated that there was pressure on the

10

nerve roots from degenerative spurring and narrowing of the neuroforamina (the opening in the spine that allows the spinal nerves to exit and travel to other parts of the body). Id. at ¶37.

On March 29, 2022, Dr. Tannan saw the plaintiff for a follow-up to discuss his ongoing issues with back pain and left knee pain. Dkt. No. 64 at ¶38. The plaintiff complained of back and leg pain going down both of his legs; he also had moderate left knee symptoms. Id. The plaintiff reported that he was unable to do any vigorous activity or exercise and was not working at the time. Id. He was taking Meloxicam and had an order for Tylenol. Id. Tannan discussed the plaintiff's MRI findings with the plaintiff; the findings showed multilevel degenerative disc disease, mild retrolisthesis (a spinal condition characterized by joint dysfunction that occurs when a single vertebra shifts backward or underneath an intervertebral disc)a and foraminal stenosis (a condition that occurs when the openings in the spine that allow nerves to pass through become narrowed). Id. at ¶39. Tannan also discussed with the plaintiff starting him on duloxetine and amitriptyline, both of which are anti-depressant and nerve pain medications that have been shown to be effective in treating chronic pain. Id. at ¶40. The plaintiff chose not to start these medications. Id.

Based on the plaintiff's conditions, Dr. Tannan referred him to pain management for consideration of an epidural steroid for his back; referred him to physical therapy for an evaluation, treatment and for a transcutaneous electrical nerve stimulation (TENS) unit for his back; referred him to Orthopedic Dr. Nelson to reconsider arthroscopy of his left knee; and placed an order for acetaminophen 650 mg. Dkt. No. 64 at ¶41. A TENS unit is a device that delivers low-voltage electrical currents at or near the nerves to block or

change a person's perception of pain with the hope of relieving that pain. Id. at ¶42.

On April 28, 2022, a physical therapist evaluated the plaintiff regarding his back pain and his left knee injury. Dkt. No. 64 at ¶43. A week later, the plaintiff arrived for his scheduled physical therapy appointment. Id. at ¶44. Physical therapist Rhodes reported that the plaintiff signed a refusal for physical therapy services at 2:15 p.m. that day, stating that he did not care to wait in the lobby because he had a visit he needed to leave for. Id. At the plaintiff's request, he was discharged from physical therapy. Id.

On May 12, 2022, Dr. Tannan placed an off-site service request for the plaintiff to be evaluated by Integrated Pain Management clinic for epidural steroid injections of his foraminal stenosis of his lumbosacral region. Dkt. No. 64 at ¶45. The evaluation was completed on June 8, 2022. Id.

On May 21, 2022, Nurse Swartout saw the plaintiff in the Restrictive Housing Unit at cell front for an assessment. Dkt. No. 64 at ¶46. The plaintiff reported that his back was hurting but was observed as "walking with a strong gait." Id. Swartout confirmed that the plaintiff's back was a chronic issue. Id. The plaintiff's acetaminophen and Meloxicam were brought to him in the Restrictive Housing Unit. Id.

On June 1, 2022, Dr. Tannan saw the plaintiff for a follow-up regarding back pain and left knee pain. Dkt. No. 64 at ¶47. For his back pain, the plaintiff's previous records indicated pain on the left side of his lumbar area, going down into the hip area. Id. At this appointment, the plaintiff claimed that the pain was in between the scapular area over the lower thoracic spine, with no radicular pain into the legs. Id. Tannan reviewed the plaintiff's x-rays and MRI with him, stating that the x-ray showed mild compression at L-3 and the

MRI showed neural foraminal stenosis. Id. For the plaintiff's left knee pain, it was determined that he had degenerative changes, a torn meniscus and a possible loose body. Id. At the time of this appointment, the plaintiff had an upcoming appointment with the pain clinic for consideration of an epidural injection for his back pain. Id. at ¶48. At the June 1, 2022 visit, Tannan ordered an x-ray of the plaintiff's thoracic spine and pelvis, placed an order referring him back to physical therapy for evaluation and treatment for his low back pain, placed a referral to orthopedics for evaluation of his left knee and ordered a low bunk for him which was in place until he was released from Oshkosh on February 8, 2023. Id. at ¶49.

On June 6, 2022, the plaintiff had an x-ray of his thoracic spine which revealed only degenerative disc disease. Dkt. No. 64 at ¶50. Two days later, the plaintiff was seen at Integrated Pain Management by Dr. John Joseph for an evaluation of his chronic mid-back pain. Id. at ¶51. Joseph reported that the MRI of the lumbar spine performed on February 18, 2022 revealed multi-level degenerative changes of the lumbar spine, greatest at L3-L4, L4-L5, and L5-S1 levels and moderate foraminal stenosis and nerve root effacement noted at multiple levels. Id. The plaintiff's diagnosis was chronic mid-back pain secondary to lumbar spondylosis. Id. Clinically, the plaintiff's symptoms appeared to be originating from L1-L2 and L2-L3 facets. Id. Joseph recommended that the plaintiff be scheduled for joint injections. Id. Joseph's recommended plan of care was to 1) schedule the plaintiff for bilateral L1-L2 and L2-L3 facet joint injections; 2) recommend lumbar epidural steroid injection if the plaintiff did not respond to the lumbar facet joint injection; 3) recommend the plaintiff follow a healthy diet and exercise to help with weight

loss; and 4) recommend daily exercise including core strengthening and stabilization exercises. Id. at ¶52.

On June 15, 2022, Dr. Tannan placed an order for the plaintiff to be seen for follow-up with a provider for back pain. Dkt. No. 64 at ¶53. According to the order, the plaintiff was seen by Dr. Daughtry on September 30, 2022. Id.

The June 1, 2022 appointment was the last appointment Dr. Tannan had with the plaintiff before he left Oshkosh on July 7, 2022. Dkt. No. 64 at ¶54.

Conservative treatment for back and knee pain refers to non-surgical management options, typically including medication like over-the-counter pain relievers, physical therapy to strengthen muscles and improve the range of motion, activity modification to avoid aggravating movement, and sometimes injections like steroid injections depending on the cause of the pain; essentially, it is treatment that aims to manage pain without requiring surgery. Dkt. No. 64 at ¶55. During the time the plaintiff was at Oshkosh, he had x-rays, MRIs and multiple sessions of physical therapy which he declined; he was seen by orthopedics and the pain clinic, had injections and was given a low bunk restriction, a TENS unit and multiple pain medication options. Id. at ¶56. And he was seen approximately nine times by an institution doctor. Id. Any delay in scheduling an appointment was not Dr. Tannan's fault. Id. at ¶57. As he asserted several times, Tannan did not schedule appointments and had no control over when patients were scheduled to be seen by him, other providers or nursing staff, or by off-site providers. Id. There is no indication that any delay worsened the plaintiff's back and left knee condition because the plaintiff's condition was chronic and not urgent or emergent. Id. at ¶58. A four-

month delay to see a provider for a chronic condition is similar to wait time in community healthcare, if not shorter. Id. at ¶59.

Based on Dr. Tannan's professional judgment and expertise, and to a reasonable degree of medical certainty, the plaintiff was provided with appropriate medical treatment and care by Tannan and by the institution's HSU staff from the time the plaintiff arrived at Oshkosh on August 4, 2021 in accordance with the community health care standards and Department of Corrections' protocols. Dkt. No. 64 at ¶60. The plaintiff was seen continuously by Dr. Tannan and other HSU staff, properly treated and appropriately referred to the off-site providers. Id.

## II. Analysis

### A.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B.    Discussion

1.    *Eighth Amendment Standard*

The court analyzes a plaintiff's claim that the defendants were deliberately indifferent to his serious medical needs under the Eighth Amendment's cruel and unusual punishments clause. Estelle v. Gamble, 429 U.S. 97, 104 (1976). An Eighth Amendment claim consists of both objective and subjective components. Farmer v. Brennan, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must show that he "is incarcerated under conditions posing a substantial risk of serious harm." Id. In the context of a claim that prison staff were deliberately indifferent to a plaintiff's serious medical need, the objective component requires the plaintiff to show that his medical need constituted a risk of an objectively serious harm. Stewart v. Wexford Health Sources, Inc., 14 F.4th 757, 763 (7th Cir. 2021) (citing Balsewicz v. Pawlyk, 963 F.3d 650, 654 (7th Cir. 2020)).

To satisfy the subjective component, the plaintiff must demonstrate that the defendant had a "sufficiently culpable state of mind." Farmer, 511 U.S. at 834. A prison official shows deliberate indifference when he "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015) (citing Farmer, 511 U.S. at 837). "The standard of deliberate indifference 'requires more than

16

negligence or even gross negligence; a plaintiff must show that the defendant was essentially criminally reckless, that is, ignored a known risk.'" Stewart, 14 F.4th at 763 (quoting Huber v. Anderson, 909 F.3d 201, 208 (7th Cir. 2018)). The evidence must show the defendant's "actual, personal knowledge of a serious risk, coupled with the lack of any reasonable response to it." Ayoubi v. Dart, 724 F. App'x 470, 474 (7th Cir. 2018) (citing Farmer, 511 U.S. at 837, 844–45).

In the context a claim of deliberate indifference against a medical provider, the subjective component requires the plaintiff to show that the medical professional's treatment decision was "so inadequate that it demonstrated an absence of professional judgment." Stewart, 14 F.4th at 763 (quoting Johnson v. Dominguez, 5 F.4th 818, 826 (7th Cir. 2021)). Put another way,

> "A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" [*Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)] (quoting *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008)). "To infer deliberate indifference on the basis of a [medical professional's] treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006).

Id.

### 2. *Plaintiff's Summary Judgment Responses*

The plaintiff's responses to the defendants' summary judgment motions are not verified. Dkt. Nos. 87-89. He did not submit admissible evidence along with his response materials. See Fed. R. Civ. P. 56(c). And the plaintiff did not respond to the defendants' proposed findings of fact, as required by the court's Local Rules, see Civil Local Rule 56(b)(2) (E.D. Wis.), and as directed by the court in its order setting the deadline for the plaintiff's response, dkt. no. 80 at

1-2. That means that the court treats the defendants' proposed findings of fact as undisputed for the purpose of summary judgment. See Civil L.R. 56(b)(4) ("The Court will deem uncontroverted statements of material fact admitted solely for the purpose of deciding summary judgment."); see also Robinson v. Waterman, 1 F.4th 480, 483 (7th Cir. 2021) (A district court may "permissibl[y] appl[y] Local Rule 56(b)(4) to deem [a movant's] facts unopposed, regardless of [a nonmovant's] later filings.").

3.  *Analysis: Manitowoc County Jail*

Nurse Capraro contends that the plaintiff cannot establish an Eighth Amendment medical care claim against her because his alleged pain did not constitute a sufficiently serious medical condition and because she did not act with deliberate indifference. Dkt. No. 68 at 6, 10-13. She also contends that she is entitled to qualified immunity. Id. at 13. The plaintiff responds that when Capraro examined him on May 31, 2021, she said she didn't notice any swelling or inflammation to his back or left knee. Dkt. No. 87 at 2. He also states that video evidence of his interactions with her shows that she delayed providing him medical treatment and gave him false information about having to pay for x-rays.[2] Id. at 3. The plaintiff asserts that Capraro should have recommended that he be transported to the emergency room, and that he was only given an x-ray after he filed a complaint. Id.

Dr. Torres contends that the plaintiff cannot satisfy the objective or subjective prong of his deliberate indifference claim. Dkt. No. 75 at 6-10. The plaintiff responds that Torres did not provide him with proper medical treatment because she did not see him until four days after he fell. Dkt. No. 89 at 1. The plaintiff says that he was in a lot of pain during this time. Id. He

---

[2] The plaintiff has not submitted any video evidence.

states that Torres knew that he had pre-existing injuries and had suffered a hard fall, yet she did not consider that he could have suffered something worse when he fell. Id. The plaintiff also asserts that Torres's decision to use a portable x-ray constituted inadequate medical care because it was not a good quality x-ray machine. Id. at 3.

After the plaintiff fell, he received ongoing medical care including frequent monitoring, daily nurse visits, a doctor appointment, medication and x-rays. Based on the plaintiff's alleged pain from his fall and the ongoing medical care he received, he arguably had a serious medical need under the Eighth Amendment. See Gutierrez v. Peters, 111 F.3d 1364, 1373 (7th Cir. 1997) (serious medical need "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention[]") (quotation omitted); see also Pyles v. Fahim, 771 F.3d 403, 411 (7th Cir. 2014) (assuming back pain incarcerated individual experienced after falling on wet stairway was a serious medical condition) (citing Jackson v. Kotter, 541 F.3d 688, 698 (7th Cir. 2008)). The court cannot conclude that the plaintiff did not have an objective serious medical need under the Eighth Amendment.

But Nurse Capraro's and Dr. Torres's actions did not amount to deliberate indifference. The court allowed the plaintiff to proceed on an Eighth Amendment claim against Capraro and Torres based on allegations that they failed to treat his complaints of pain. Dkt. No. 5 at 11. When Capraro first saw the plaintiff on May 31, 2021, she assessed his medical condition and obtained the Tylenol that the jailer mistakenly had failed to give him the prior evening. Capraro also spoke with Torres about the plaintiff's condition, and she obtained for the plaintiff a prescription for Tylenol 1000 mg for seven days, an

ice pack and medical monitoring. Capraro saw the plaintiff the next day (June 1, 2021). She communicated medical information to Torres so that Torres could determine how to proceed with the plaintiff's medical care and medications. Capraro followed Torres's medical orders, which included keeping the plaintiff in a medical segregation cell, monitoring him, providing him with prescribed medications, assessing him, coordinating x-rays and obtaining the radiology report. She also completed a "Health Transfer Summary" when the plaintiff transferred to Dodge on June 10, 2021.

Dr. Torres relied on reports from Nurse Capraro and other medical staff who assessed and evaluated the plaintiff to prescribe him medication and direct staff to care for him on the day he fell (May 30, 2021) and the two days after he fell. On the third day after the plaintiff fell, Torres examined the plaintiff personally and adjusted his pain medication prescriptions. Torres provided the plaintiff with Tylenol, ice, medical monitoring and x-rays while he was at the jail.

The plaintiff believes that Nurse Capraro and Dr. Torres should have done more to treat his condition, such as referring him offsite to the emergency room and/or ordering an MRI. But the plaintiff's assertions that he did not receive adequate care and that he disagrees with the treatment he received amount only to "an unwillingness to accept the professional judgment of his treating [medical professionals] and is not a basis for establishing deliberate indifference." Dobbey v. Liping Zhang, 608 F. App'x 406, 408-09 (7th Cir. 2015) (incarcerated individual who asserted that prescribed medications did not treat his back pain and that he should have been referred to an outside specialist or given an MRI did not establish deliberate indifference because he did not submit evidence to support his assertions so his disagreement was nothing

more than unwillingness to accept the professional judgment of treating physicians) (citing Berry v. Peterman, 604 F.3d 435, 441 (7th Cir. 2010)); see also Pyles v. Fahim, 771 F.3d 403, 411 (7th Cir. 2014) (An MRI is simply a diagnostic tool, and the decision to forego diagnostic tests is "a classic example of a matter for medical judgment.").

"[A] medical professional's erroneous treatment decision can lead to deliberate indifference liability if the decision was made in the absence of professional judgment." Johnson v. Doughty, 433 F.3d 1001, 1012-13 (7th Cir. 2006) (citing Collignon v. Milwaukee County, 163 F.3d 982, 989 (7th Cir. 1998) ("A plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances."); Estate of Cole by Pardue v. Fromm, 94 F.3d 254, 261-62 (7th Cir. 1996) ("[D]eliberate indifference may be inferred based upon a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment."). The plaintiff has not submitted evidence establishing that the treatment decisions made by Dr. Torres and Nurse Capraro were a substantial departure from accepted professional judgment. He has not established that they acted with deliberate indifference, and the court will grant their motions for summary judgment.

### 4. Analysis: Oshkosh Correctional Institution

Dr. Tannan contends that he is entitled to summary judgment because the plaintiff's medical records demonstrate that he received extensive and

appropriate medical treatment and pain management. Dkt. No. 63 at 9. Tannan also asserts that he did not disregard the plaintiff's medical condition, and that he did not have control over the four-month delay seeing the plaintiff after the physical therapist referred the plaintiff back to him when conservative physical therapy treatment was not effective. Id. at 11. Tannan also contends that the plaintiff can offer no evidence that the delay worsened his condition. Id. He maintains that he is entitled to qualified immunity. Id. at 13. The plaintiff responds that Tannan acted with deliberate indifference in that he ignored the plaintiff's request, and the radiologist's recommendation, for an MRI. Dkt. No. 88 at 2. He also argues that Tannan ignored the physical therapist, Paschke, who referred the plaintiff back to Tannan to change the plaintiff's plan of care. Id. The plaintiff asserts that Tannan referred him for an MRI only after the plaintiff filed a complaint against him. Id. According to the plaintiff, the delay in medical care does not have anything to do with who scheduled appointments. Id. He says that he "wrote so many health request[s] & Dr. Tannan ignored them all, along with all recommend[ed] requests for [the plaintiff] to have MRI[.]" Id.

The court allowed the plaintiff to proceed on an Eighth Amendment deliberate indifference claim against Dr. Tannan based on an alleged almost four-month delay in seeing him after the physical therapist referred him back to Tannan on October 6, 2021 because the conservative treatment for his back and left knee was not effective. Dkt. No. 5 at 12-13. Tannan contends that he cannot be found liable for the delay because he does not schedule appointments. He says that patients are seen by nurses and that if a nurse decides a patient should see a doctor, the nurse has the MPAA schedule an appointment with the doctor. Tannan also points out that the plaintiff suffered

22

from a chronic condition, had been receiving other forms of treatment and that a delay in seeing a doctor for a chronic, non-emergent condition such as the plaintiff's is not unreasonable.

It is undisputed that Dr. Tannan did not schedule his own appointments and that he did not have control over scheduling. The institution MPAA schedules appointments based on priority of a patient's condition and provider availability. Although the plaintiff's response states that he submitted multiple requests to Tannan for medical care, the plaintiff's response is unverified. The record does not contain evidence that Tannan had any control over scheduling the plaintiff's next appointment with him. In other words, Tannan was not responsible for the delay. Other medical professionals prioritized patients' appointments with Tannan, and the plaintiff's chronic and non-emergent medical condition was given a lower priority than some other incarcerated individuals' medical conditions. Section 1983 limits liability to public employees who are personally responsible for a constitutional violation. Burks v. Raemisch, 555 F.3d 592, 595-96 (7th Cir. 2009). For liability to attach, the individual defendant must have caused or participated in a constitutional violation. Hildebrandt v. Ill. Dep't of Nat. Res., 347 F.3d 1014, 1039 (7th Cir. 2003). The undisputed facts demonstrate that Tannan was not responsible for the delay in scheduling the appointment to see him because he did not schedule appointments.

Nor has the plaintiff submitted evidence showing that the delay in seeing Dr. Tannan worsened his condition. See Gabb v. Wexford Health Sources, Inc., 945 F.3d 1027, 1033-34 (7th Cir. 2019) (incarcerated individual who lacked evidence that failure to refer him for better treatment caused decline could not show that treatment he received caused him harm) (citing Langston v. Peters,

100 F.3d 1235, 1240 (7th Cir. 1996) ("[A]n inmate who complaints that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed."). Treatment for chronic, nonemergent medical issues is limited. The plaintiff already had been prescribed pain medication and, although it appears that he did not regularly refill his prescriptions for the medication, he was receiving some treatment. The plaintiff would have liked things to move more quickly—he would have liked to receive an MRI, and not to have been prescribed such conservative forms of treatments. But the plaintiff "has no evidence any course of treatment . . . would have provided him relief for his chronic back pain." Gabb, 945 F.3d at 1033-34 (citing Petties v. Carter, 836 F.3d 722, 733 (7th Cir. 2016) (concluding the plaintiff could not pursue his claim against the prison doctor for failing "to explore surgery as an option" in part because the plaintiff "did not produce medical evidence confirming that he would have benefited from surgery")).

A reasonable factfinder could not conclude that Dr. Tannan acted with deliberate indifference to the plaintiff's serious medical need. The court will grant Dr. Tannan's motion for summary judgment.

## III. Conclusion

The court **GRANTS** defendant Tannan's motion for summary judgment. Dkt. No. 62.

The court **GRANTS** defendant Capraro's motion for summary judgment. Dkt. No. 67.

The court **GRANTS** defendant Torres's motion for summary judgment. Dkt. No. 74.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. Rule of App. P. 4(a)(5)(A).). If the plaintiff appeals, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a motion *in this court*. See Fed. R. App. P. 24(a)(1). The plaintiff may be assessed a "strike" by the Court of Appeals if it concludes that his appeal has no merit. If the plaintiff accumulates three strikes, he will not be able to file a case in federal court (except a petition for *habeas corpus* relief) without prepaying the full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. Id.

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2).

25

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 27th day of August, 2025.

BY THE COURT:

**HON. PAMELA PEPPER**
**Chief United States District Judge**